## TERRITORY OF HAWAII *v.* TSUTAICHI KAWANO.

ERROR TO CIRCUIT COURT, SECOND CIRCUIT.

ARGUED APRIL 10, 1911. DECIDED MAY 5, 1911.

ROBERTSON, C.J., PERRY AND DE BOLT, JJ.

OATH—*administration of.*

An oath administered to a witness by the clerk that the evidence he shall give "shall be the truth, the whole truth and nothing but the truth," omitting the invocation, "so help you God," which was correctly interpreted to the witness, the interpreter adding thereto the words, "so help you God," is valid.

EVIDENCE—*cross-examination of interpreter.*

The right to subject an interpreter, on the witness stand, to cross-examination on the foreign expressions and terms used by him as interpreter, or used by the witness for whom he has acted as interpreter, is a right well recognized by law, and is founded upon the general rules and principles which govern cross-examination of other witnesses.

TRIAL—*remarks of court—argumentive instructions.*

Remarks and instructions of the court to the jury which are argumentive comparisons relative to the credibility of witnesses, commending one and disparaging the other, their testimony being vital and diametrically in conflict, are unfair, prejudicial and erroneous.

TRIAL—*instructions, theory of.*

Instructions are given on the theory that they are expositions of the principles of the law applicable to the case, or some branch or phase of the case, which the jury are bound to apply in order to render a verdict responsive to the evidence adduced. They should be pointed, concise and definite, covering, however, the whole case, i. e., "the points of law involved therein." R. L. Sec.

1801.  They should not be ambiguous, inconsistent or contradictory; nor should they extend to abstract propositions of law.

The court has no right to attempt to discredit instructions already given.

### OPINION OF THE COURT BY DE BOLT, J.

The defendant (plaintiff in error) having been convicted of the crime of perjury in the circuit court of the second circuit and sentenced to imprisonment at hard labor for the period of eighteen months, brings the case here on a writ of error.

The perjury is alleged to have been committed at the hearing of certain interpleader proceedings brought by the sheriff before the circuit judge of the second circuit, at chambers, for the purpose of having the ownership of a certain billiard table, held under a writ of attachment, judicially determined as between M. Daido and M. Nozaki. The defendant claims that Nozaki was the owner of the table and that he agreed to and did sell it to Daido; that Daido, not having the necessary funds with which to pay for the table, borrowed $100 from the defendant for that purpose, giving him his note therefor; that the note not being paid at maturity, the defendant brought suit against Daido on the note and caused the table to be attached as the property of Daido. Upon the table being attached Nozaki filed with the sheriff a claim, stating that he, and not Daido, was the owner, whereupon the interpleader proceedings above mentioned were instituted. The prosecution contends that Nozaki did not sell the table to Daido, but that an arrangement was entered into between them to open a billiard hall, Nozaki furnishing the use of the table and Daido contributing his services, and the profits to be divided between them. The prosecution admits that Daido borrowed the $100 from the defendant, but claims that it was borrowed for the purpose of sending it home to Japan, and that Nozaki had no knowledge of the transaction.

As to the testimony upon which the alleged perjury is predi-

cated, the indictment charges that the defendant, on December 9, 1909, before the circuit judge, at chambers, as a witness in the interpleader proceedings,

"did then and there wilfully, knowingly, falsely and feloniously, in substance and effect, among other things, state and swear that, in Hana, Maui, on the 21st day of August, 1909, he Tsutaichi Kawano, loaned one hundred dollars to M. Daido; that thereafter, on and during the same day, upon the invitation of said Daido, he, Tsutaichi Kawano, and others, went to said Daido's house in Hana, the purpose being to celebrate the purchase from Masataro Nozaki by M. Daido of said billiard table; that when he, Tsutaichi Kawano, got to Daido's house, Daido took from his (Daido's) pocket the hundred dollars which he (Tsutaichi Kawano) had loaned to Daido that morning, and put it on the table, Daido as he did so saying to Nozaki: 'this is the final settlement for the transaction,' meaning thereby the purchase of the billiard table: That Nozaki took the money, and put it in his (Nozaki's) pocket, saying: 'this is the final transaction.' * * * Whereas, in truth and in fact, as the said Tsutaichi Kawano then and there well knew, said M. Daido did not, at his (Daido's) house, in Hana, Maui, on the 21st day of August, 1909, in the presence of Tsutaichi Kawano and others, take from his (Daido's) pocket the one hundred dollars which he (Tsutaichi Kawano) had loaned to Daido that morning, or any other sum of one hundred dollars, and put it on the table; Daido as he did so saying to Nozaki: 'this is the final settlement for the transaction,' meaning thereby the purchase of the billiard table; that in truth and in fact, as the said Tsutaichi Kawano then and there well knew, said Nozaki did not, at Daido's house, in Hana, Maui, on the 21st day of August, 1909, in the presence of Tsutaichi Kawano and others, take said one hundred dollars and put it in his (Nozaki's) pocket, saying: 'this is the final transaction.' That in truth and in fact, as the said Tsutaichi Kawano then and there well knew, he, the said Tsutaichi Kawano, did not see the sum of one hundred dollars, nor was the sum of one hundred dollars, paid or handed over by said Daido to said Nozaki, or received by said Nozaki from said Daido at or in said Daido's house, in Hana, Maui, on the 21st day of August, 1909."

Fifty-eight errors are assigned, but in the view we take of the case it will not be necessary to consider all the questions presented.

The first assignment relates to the validity of the oath as administered by the clerk through the interpreter to the defendant as a witness in the interpleader proceedings. The oath was administered in the following manner, that is to say, while the clerk, the interpreter and the witness were all standing with their hands raised, the clerk said, addressing the witness: "You do solemnly swear that the evidence you shall give in this matter before this court shall be the truth, the whole truth, and nothing but the truth," omitting the invocation, "so help you God." The interpreter thereupon correctly interpreted the oath as repeated by the clerk, adding thereto the words, "so help you God," to which the witness assented. The oath, as thus administered, was the same in effect as if the clerk had used the words, "so help you God," in the first instance. The oath, in our opinion, is valid. *Com.* v. *Jongrass,* 181 Pa. St. 172.

The second, third, fourth and fifth assignments relate to the refusal of the court to permit counsel for the defendant to cross-examine the witness, Otsuka, who acted as the official Japanese interpreter at the hearing in the interpleader proceedings, and through whom the defendant as a witness in those proceedings was sworn and testified. Counsel sought to obtain from the witness, Otsuka, what he had said to the defendant in administering the oath to him, and also what the defendant had said to him relative to the supposed statements upon which the alleged perjury is based. Upon this phase of the case we quote from the record as follows, the interpreter being under examination as a witness called by the prosecution:

"Mr. Case: Will you tell—In interpreting that oath—will you tell us what you interpreted to Kawano? When you interpreted the oath to Kawano, what did you say?

Territory v. Kawano, 20 Haw. 469.

"The Court: Why, that would be in Japanese. You can ask him if you wish if he interpreted or translated correctly.

"The Court: When you interpreted the oath, did you interpret correctly?

"A. Oh, Yes sir.

"The Court: Proceed.

"Mr. Prosser: I move that be stricken out on the ground that the best evidence is what he actually said in Japanese to the defendant and not a conclusion that he interpreted the oath correctly.

"The Court: The motion is overruled and you have an exception. I don't think I could judge the Japanese language. The witness has stated that he interpreted correctly. * * *

"Mr. Prosser: Mr. Otsuka, will you give in Japanese the words which you addressed to the defendant when you swore him?

"The Court: I don't know why you ask that question. The stenographer can't take it down and I don't believe the witness can answer the question. I am sure I will not understand it and am quite certain that you will not. The question is not allowed. * * *

"Q. I will ask you to give in the Japanese language the statements which you made to the witness or the defendant here, at this trial and the answers that he gave to you in that trial. * * *

"The Court: It is entirely a new thing to make this a Japanese Court. I want you to understand that this is an American Court and I ask you what authority you have for asking such a question. * * * I overrule the questions; I sustain the objection.

"Q. When Kawano told you, after taking the oath about which you have testified, that he saw the hundred dollars in ten gold pieces paid by Daido to Nozaki, your question to him and his answer to you were both in the Japanese language were they not?

"A. I translated from English to Japanese and Japanese answer I translated into English. * * *

"Q. Will you state in Japanese what the questions were that you asked the defendant and what his answers were?

"The Court: The objection is sustained, and you have an exception."

As regards the refusal of the court to permit counsel to cross-examine the witness on the statements involving the question of perjury, it will be observed that the indictment charges, and the record shows that it was the theory of the prosecution throughout the trial, that the defendant, as a witness in the interpleader proceedings, testified positively and unequivocally that on the night of August 21, 1909, at Daido's house, Daido took $100 from his pocket, put it on a table, saying to Nozaki: "this is the final settlement for the transaction," and that Nozaki took the money and put it in his pocket, saying: "this is the final transaction." The defendant contends that he did not testify positively as to those matters, but that he prefaced his statements with the explanation to Otsuka, the interpreter, that what he was about to testify to was what he believed to be true by reason of having been so informed by Daido. The witness, Otsuka, on direct examination had testified that the defendant made the positive statements as quoted in the indictment. Upon this phase of the case, as shown by the record, which we have quoted, counsel for the defendant on cross-examination sought to obtain from the witness Otsuka, what he had said in the Japanese language to the defendant and what the defendant had said to him in the Japanese language, while testifying as a witness in the interpleader proceedings, but the court would not permit the witness to answer. The ruling of the court in this regard was contrary to authority and reason, and it cannot be sustained. The right to subject an interpreter, on the witness stand, to cross-examination on the foreign expressions and terms used by him as interpreter, or used by the witness for whom he has acted as interpreter, is a right well recognized by law, and is founded upon the general rules and principles which govern the cross-examination of other witnesses.

In the case of *Schnier v. The People,* 23 Ill. 1, 22, the court held that where evidence was given through an interpreter, and there was a dispute as to the meaning of any word in the for-

Territory v. Kawano, 20 Haw. 469.

eign language, it was proper to require the interpreter to give the primary meaning of all words used in connection with the word in dispute, so that the jury would be able to determine its meaning in case of a disagreement among the interpreters; and the court was also of the opinion that other witnessess versed in the language should be permitted to testify as to the meaning of any important word. Upon this subject the court said:

"The object of all evidence is to inform the jury or tribunal to whom the issue is submitted, of all the facts in dispute, precisely as they occurred. The nearer that tribunal can, through the aid of evidence become eye and ear witnesses of the transaction, the nearer will they be enabled to do strict justice between the parties. Hence witnesses are required to detail what the parties did and said. And in detailing conversations, or admissions, the rules of evidence require that, as far as practicable, the language employed by the party should be detailed by the witness. It is by this means that the jury or court trying the issue is enabled to arrive at the intention of the party employing the language. When the language used by the party, and testified to by the witness, is understood by the triers, they can have no difficulty in arriving at the meaning attached to it by the person using it. But to do so, it is always desirable that the witness shall, as far as possible detail to the jury the very same language, in precisely the same connection, in which it was employed by the person using it, otherwise it will necessarily be merely an accident if the jury obtain the sense in which it was spoken. When the facts, conversations or admissions admissible in evidence, are known to a person who does not understand and speak the language in which the trial is conducted, then the only means by which the jury or court trying the issue can arrive at the facts, is from the evidence through an interpreter who understands and speaks both languages. And when he is so employed, it is his duty to translate the evidence given by the witness into equivalent terms of the language employed by the tribunal trying the cause. All persons are aware of the fact, that the power to make a literal translation from one language to another, so as to preserve in the translation the precise meaning of the original, depends upon the accurate knowledge of both languages by the translator. This being the

office of an interpreter, if the person employed is not well versed in each language, he is liable to fail in giving the jury the facts, circumstances, conversations and admissions just as they were detailed by the witness, and if that is not done, the party against whom the mistake is made must suffer wrong, unless he shall be permitted to call others who are more capable of translating the language correctly. This, we think, is the right of the party. It cannot be the law that because an interpreter is called who is not capable of correctly translating the evidence, or from bias or partiality renders it incorrectly, that parties must be bound by it, although it may affect their most vital and important rights. In this case the witness was permitted to testify. as to the sense in which he understood the accused to employ this term, and we can perceive no objection in permitting the accused to introduce evidence of the primary meaning of the word, and its meaning in the connection in which it was used. In all cases of such disputes, as to the meaning of a word in the foreign language, it would be proper that the court require the interpreter to give the primary meaning of all words used in connection with the word in dispute, that the jury might be enabled to determine its meaning in case of disagreement of the interpreters."

There seems to be no authority against the proposition for which the defendant contends; and, presumably by reason of the fact that a right so apparent and self-evident is seldom questioned, there are but few authorities to be found on the point. 17 Am. & Eng. Ency. Law, 30; *Ulrich* v. *People,* 39 Mich. 245, 251; *Thon* v. *Roch. Ry. Co.,* 29 N. Y. Sup. 675.

In the case at bar the vital question to be determined was, What did the defendant say in Japanese, and what was its equivalent in English, regarding the payment of the money by Daido to Nozaki? Had counsel been permitted to obtain from Otsuka the precise Japanese words used by the defendant it would have been a very simple matter to have tested the accuracy of Otsuka's translation by others versed in the English and Japanese languages; but, notwithstanding the vital importance of this right to the defendant, the court unhesitatingly permitted the testimony of Otsuka on this crucial point

to go to the jury as elicited by the prosecution, denying the defendant the invaluable right to test it by cross-examination. Wigmore on Ev., §§1362, 1367. It is immaterial whether the translation as rendered by Otsuka was correct or not; the defendant had the absolute right to test that translation with the view of showing that it was inaccurate, if such were in fact the case. Not until it has been definitely established what the defendant actually said in the Japanese language as to the money transaction of August 21, 1909, i. e., whether he swore that he actually saw the transaction, or was only relating what Daido had told him, can it be said with that moral certainty, which the criminal law requires, that he has committed perjury. The record before us leaves this important question in doubt. We all know how difficult it is to relate with exactness what we may have heard in our own language; and the difficulty and danger of mistake is greatly increased when statements must pass from one language through the medium of an interpreter into another language. To interpret or translate from one language to another with accuracy and reasonable safety requires a high degree of efficiency in both languages. The circuit judge said, and the record before us bears him out in the statement, that Otsuka, who acted as interpreter in the interpleader proceedings, did not "talk English well."

The court also should have allowed counsel to cross-examine the witness as to the oath.

The sixth assignment is based upon the ruling of the court in permitting the prosecution, over the objection of the defendant, to introduce in evidence the stenographer's transcript of the testimony supposed to have been given by the defendant as a witness in the interpleader proceedings. In those proceedings the defendant, as we have already observed, testified through an interpreter and his testimony was taken down in shorthand as translated by the interpreter. The prosecution introduced the transcript, as it was claimed, to show the materiality of the testimony of the defendant as given in the in-

terpleader proceedings. This, it is urged, was error. As the case must be remanded for a new trial on other grounds, and as this question need not arise again, owing to the ease with which it may be avoided by calling the interpreter as a witness to prove the correctness of his interpretation preliminary to offering the transcript in evidence to show the materiality of the testimony, we deem it unnecessary to express any opinion on the ruling of the court in admitting the transcript in evidence without proof of its correctness in the way suggested. But we desire to point out that this evidence having been offered and received for the purpose of showing the materiality of the alleged false testimony, a question addressed to the court, the jury should have been instructed that the transcript was not to be considered by them as evidence of the truth or falsity of the defendant's statements. *Higgenbotham* v. *State* (Tex.), 6 S. W. 201; *People* v. *Macard,* 109 Mich. 623, 629; *State* v. *Vandemark,* 77 Conn. 201, 206; *State* v. *Justesen* (Utah), 99 Pac. 456.

The seventh, eighth and tenth assignments, relating to the cross-examination of the witness Otsuka and the remarks of the court made in that connection, as well as the forty-ninth assignment, relating to an instruction of the court given by its own motion to the jury (instruction "F") will be considered together as they present substantially the same questions. We quote from the record as follows:

"Q. Is it not a fact that you were discharged from the position because you were incompetent?

"A. No, sir. Never.

"Q. Now, I will ask you if it is not a fact that in this very court-room in the month of August last you were told by the Judge that he didn't have any confidence in you and didn't want you to be here at all?

"A. In August?

"Q. Is that not so?

"A. Yes, sir.

"The Court: I don't think that is fair to the interpreter as it leaves an unjust impression with the jury."

"The Court: I don't think that I said that; but I did say that he didn't talk English well. He had a habit of coming into the Court room and listening to the cases and waiting to be called as interpreter and I called him down time and time again. All the interpreters did the same thing and I got angry, but I never questioned his honesty or integrity."

"The Court: I ask counsel to make an explanation because it is due both to myself and to the witness because it was not true in the sense he has stated. I made it a rule that I would not have them waiting for jobs as interpreters. That is what I referred to. I would not have him hanging around for a job.

"Mr. Prosser: I take exception to the court's remarks in the presence of the jury.

"The Court You may have an exception, and I wish you would take your seat."

"The Court: Have you any more witnesses with regard to the exception made by the Court with regard to the Interpreter Otsuka? Do you think it is due to the Interpreter to make an explanation of what I stated?

"Mr. Prosser: I think that is within the jurisdiction of the Court. This very feature was anticipated by me at the time that I filed my suggestion of disqualification. I thought at the time that it would be necessary for Your Honor to appear as a witness in the case.

"The Court: The Court will not appear as a witness. There has been some testimony that the Court is not always careful. There seems to be an attack upon the interpreter, although Judge Kepoikai stated as much as I can state. And I will say this that I have no memory of a definite statement except in a general way. * * * He has been here since last August."

(Instruction F): "If the jury agree with the position taken by the defendant that the court interpreter Otsuka did not honestly or did not honestly and correctly interpret to the witness defendant the questions that were asked the defendant and did not or did not honestly and correctly interpret what defendant said in reply to those questions,—in other words, if the said interpreter Otsuka falsely interpreted the testimony in that case and that the testimony or alleged testimony is a pure fabrication, then you should at least be able to find some motive

for such a wicked act on the part of the interpreter. If by your verdict you show that the court interpreter Otsuka has committed perjury in this case, you ought to find if you can some motive for his action, for sane men do not act without some motive."

By this instruction together with the remarks as quoted above, the court, in effect, told the jury that in order to acquit the defendant they must necessarily conclude that Otsuka had deliberately committed perjury himself; and the court, it will be observed, thereupon cautioned the jury that before reaching the conclusion that Otsuka was a perjurer they should find some motive on his part for the commission of such a "wicked act," because "sane men do not act without some motive;" thus eliminating every possibility of a finding of an honest mistake on his part. However forceful and appropriate this language might have been as an argument by counsel, the use of such language by the court was not only improper but it was unfair and prejudical to the defendant. As we read and construe the remarks and the instruction, they constitute an argumentive comparison upon the relative credibility of the defendant and Otsuka where their testimony was vital and diametrically in conflict. The court in plain terms said of Otsuka, "I never questioned his honesty or integrity," thus commending him to the jury as a witness upon whom they could safely rely, thereby disparaging the credibility of the defendant. Section 1798, R. L., provides that "the jury shall in all cases be the exclusive judges of the facts * * * and the judge * * * shall in no case comment upon the character, quality, strength, weakness or credibility of any evidence submitted, or upon the * * * reliability of any witness." These provisions were violated by the judge in the case at bar. The remarks of the court and the giving of the instruction were clearly erroneous. *Territory* v. *O'Hare,* 1 N. D. 30, 48; *McMinn* v. *Whelan,* 27 Cal. 300, 320.

The fifty-fourth assignment relates to instruction "K,"

given to the jury by the court of its own motion. After having instructed the jury at length as requested by the prosecution and the defendant, the court then gave the instruction complained of, saying:

"Gentlemen of the jury, you have the evidence and have heard able counsel and have been given many instructions on points of law. It has seemed to me that often juries are more confused than enlightened by the instructions read to them. Their attention is too much directed to fine points and legal distinctions in oft repeating and over-lapped instructions that courts feel bound to give because counsel demand them and it is the law. Yet their application and necessity are doubtful. Do not despair if you do not all understand alike all or any of the instructions and believe me that the more you study law the less you will agree about many of them. The considering and the understanding and the agreeing about the instructions is not the aim or object of your present service. You will not perhaps be under the necessity of at all referring to them. It is the guilt or innocence of the defendant that concerns you. So think of the evidence and decide as you think you should, remembering that if you have a reasonable doubt as to any material thing necessary to constitute guilt, you give the defendant the benefit of it.

"I believe you know what constitutes perjury as well as I do and knew it before you ever heard my voice. You know what is meant by a material fact; you know what is meant by oath, court, cause, case, issue, wilful, knowingly and maliciously, and the other terms we often struggle to define until they are but kernels in a mass of chaff in the minds of the average juryman. Be not discouraged and do not confuse the fact that you do not understand all these terms with the idea that you do not understand enough to decide this case. And do not think that you must understand and be able to see the reason of the acts of defendant so as to see a good and a sufficient cause for them or else you are in a state of reasonable doubt so often referred to. There is a vast difference between not understanding everything and not knowing anything. Not to understand the reason for an act or see its reasonable cause is different from being in a state of reasonable doubt. There is no good and sufficient reason for any sin and it is in a sense unaccountable and

unexplainable, but yet we know sin exists, and as to many sinful acts we may not be in a state of reasonable doubt. The reasonable doubt that is to cause you to give its benefit to the defendant is a doubt of that kind arising out of the evidence, or a want of evidence; not one raised by declaration of counsel and not one raised by want of power to remember and fully understand all the court's instructions. The evidence, the facts proven by it, and their relation to the great question of guilt, or innocence is what specially concerns you. If looking at the evidence you are in doubt as to the law applicable, then call to mind the instruction which governs, and if there is none or you want further explanation on a point of law the court will give it to you.

"The court has confidence in your ability as well as in your integrity and does not doubt but what you can and will come to a correct conclusion and a just verdict.

"Do not be confused with attempts to define legal metaphysical terms and do not go to your jury room with minds bound in fetters and chains made up of words, words, words, supposed to be for the purpose of enlightening your minds as to the legal principles applicable to the case. You need not be fettered, but can be free and with clear unfettered and unbound minds look you at the stubborn facts you find proven on this trial and decide as you find right and justice requires."

We cannot approve of this method of instructing a jury. The court having instructed the jury at length as requested by counsel, those instructions became the law of the case, and the court was in duty bound to assume that they correctly stated the law applicable to whatever state of facts there was evidence tending to prove, otherwise they should not have been given. The court had no right to attempt to discredit the instructions already given. Instructions are given on the theory that they are the exposition of the principles of the law applicable to the case, or some branch or phase of the case, which the jury are bound to apply in order to render a verdict responsive to the evidence adduced. They should be pointed, concise and definite; covering, however, the whole case, i. e., "the points of law involved therein," R. L. Sec. 1801. They should not be am-

biguous, inconsistent or contradictory; nor should they extend to abstract propositions of law.

Whatever might be said in favor of some of the matters mentioned by the court in the instruction now before us, or however appropriate a consideration of the matters involved in them by the legislature might be, a discussion of such matters is entirely out of place in a court of justice. They have no application to trial by jury under our present system of procedure. Instructions of the character in question are not only erroneous but they tend to confuse and mislead the jury. The court, therefore, in giving this instruction committed error.

Other errors assigned need not be considered as they involve questions which probably will not arise at the new trial, or, if they do, will arise under different circumstances.

The judgment of the circuit court is reversed and the defendant is granted a new trial.

*D. H. Case, County Attorney of Maui (Alexander Lindsay, Jr., Attorney General, and Enos Vincent, Deputy County Attorney of Maui, with him on the brief), for the Territory.*

*M. F. Prosser (Kinney, Ballou, Prosser & Anderson on the brief) for defendant.*